[No. 34310. *En Banc.* December 1, 1958.]

TERRENCE McCORMICK, *Appellant,* v. MILNER HOTELS, INC., *Respondent.*[1]

HUNTER, MALLERY, and ROSELLINI, JJ., dissent.

*Burgess & Lambert,* for appellant.

*Clarke, Clarke, Albertson & Bovingdon* and *George Bovingdon,* for respondent.

HILL, C. J.—This is an action for injuries sustained by the plaintiff, as a result of the breaking of a porcelain faucet

[1]Reported in 332 P. (2d) 239.

handle in an apartment occupied by him as a tenant in the defendant's apartment-hotel. The tenancy was from month to month.

The recent case of *Bidlake v. Youell, Inc.* (1957), 51 Wn. (2d) 59, 315 P. (2d) 644, while similar in many respects, is not decisive of the present case. It was there decided that it had not been established that it was unreasonably dangerous to use a porcelain faucet handle. There was no evidence or even contention in that case that any amount of inspection would have revealed any defect in the faucet handle, which broke. In the present case, it is contended that the defendant's manager had been advised that there was a crack in the porcelain faucet handle and that it should be replaced.

The plaintiff seeks to come under the well-recognized exception to the general rule of the landlord's nonliability for injury from defects, *i.e.,* that the landlord does have a duty to disclose or repair latent defects actually known to him and unknown to the tenant. *Mesher v. Osborne* (1913), 75 Wash. 439, 447, 134 P. (2d) 1092, 48 L. R. A. (N.S.) 917.

■ The trial court's finding VI is:

"That porcelain faucet handles are in general use in the City of Seattle; that porcelain faucet handles are used by the largest chain of hotels having establishments in the State of Washington, including the Olympic Hotel of Seattle, which is uniformly so equipped throughout all its guest rooms; that they are in use in many apartments of quality in the Seattle area; that where porcelain faucet handles have been replaced, such replacement has generally occurred by reason of style or fashion and has not occurred by reason of considerations of safety; that poreclain faucet handles have certain marked advantages over metal faucet handles, which are constructed of plated brass or bronze."

No error is assigned to this finding, and it furnishes the answer to any contention that a porcelain faucet handle is dangerous *per se.*

The evidence supporting the plaintiff's contention that the defendant had knowledge that the porcelain faucet handle, which broke, was cracked and dangerous, is epit-

omized in the plaintiff's proposed finding No. V, which was as follows:

". . . that Peter Sanstol went to plaintiff's room in response to the complaint and inspected the faucet and immediately reported to defendant manager that there was a crack in the underneath portion of the porcelain faucet handle and that the handle should be replaced . . . that the defendant, its manager or servants failed to do anything about the faucet; that the testimony of Peter Sanstol, defendant's employee, was undisputed . . . ."

(It should be noted that the "complaint" referred to in the proposed finding just quoted was about a dripping faucet, and there is no suggestion that the condition of the porcelain handle caused the dripping.)

The trial court refused to make this proposed finding. It, quite obviously, did not believe that Peter Sanstol regarded the condition of the faucet handle as dangerous, or that he reported it to the manager of the apartment-hotel as such, even though his testimony—to quote from the memorandum opinion—"so far as word of mouth is concerned stands undisputed."

This is the crux of the appeal. There was testimony which, if believed, would have supported a determination of liability. The trial court did not believe that testimony, and, consequently, the plaintiff did not sustain his burden of convincing the trier of the fact that the defendant had knowledge or was chargeable with knowledge that the porcelain faucet handle, which broke, was defective and dangerous to use. The basis of the appeal is that the trial court erred because it did not believe the plaintiff's key witness, Peter Sanstol.

Even from the "cold record" it is apparent that Sanstol was, as the trial court commented, "quite a willing helper to a cause he believes in." There is a circumstance which would make us doubt, as the trial court makes clear it did, whether at any time prior to the plaintiff's accident Sanstol ever believed the faucet handle to be dangerous; and whether he ever so advised the defendant's manager. That circumstance is that despite an almost father-and-son

relationship with the plaintiff, testified to by Sanstol, he never advised the plaintiff that it was dangerous to use the porcelain faucet handle. It is not for us, under such circumstances, to tell a trial court or a jury what witnesses should be believed. See *Gilmartin v. Stevens Investment Co.* (1953), 43 Wn. (2d) 289, 261 P. (2d) 73.

■ The trial court found (finding No. VII),

"That there was no defect existing in the faucet handle involved herein and known to or discoverable by the defendant, or any of its agents, at the time the plaintiff went into occupancy of Apartment 48; that there was nothing about the condition of said faucet handle from which it could have been determined by visual inspection that the same was in any way dangerous or hazardous; that porcelain appliances are manufactured by firing a clay and then applying and fixing, by a second firing, a glossy glaze thereon; that by virtue of the physics of uniting a surface glaze to the underlying fired clay, chemical stain or surface checking will often result, which has no effect upon the underlying structure or strength of the appliance; that prior to the breaking of the porcelain faucet handle herein and the examination of its interior, nothing in the surface appearance would have disclosed other than a surface check or chemical stain."

That finding is based on conflicting testimony. We certainly cannot say that the evidence preponderates against the finding.

■ There is, under the facts as found by the trial court, no obligation or duty on the part of the defendant to either change the porcelain faucet handle, or to warn the plaintiff of possible danger. No duty to act or to warn having been established, there was no breach of duty by the defendant, and the trial court's order of dismissal is affirmed.

DONWORTH, FINLEY, WEAVER, OTT, and FOSTER, JJ., concur.

HUNTER, J. (dissenting)—I am in agreement with the majority that under finding of fact No. VI to which no error was assigned, porcelain faucet handles, for the purpose of this appeal, are not dangerous *per se*. However, I believe this appeal presents the further question: whether *cracked*

*porcelain faucet handles* constitute a latent dangerous defect under the facts of this case.

Here, Peter Sanstol, a student clerk in the respondent's hotel and relatively close friend of the appellant, testified that in response to a complaint by the appellant of a dripping faucet, he went to the appellant's room to inspect the same. He stated that *upon close examination* of the faucet *he saw a crack* on the underside of the handle *and* that he *reported this crack* to Mr. Courtner, the manager of the respondent's hotel. Mr. Courtner had moved away prior to the trial without leaving a forwarding address and was, therefore, not available as a witness for either party. The trial court found, however,

". . . That on two occasions Sanstol advised the manager of a 'cracked faucet' . . ." (finding of fact No. V.)

Further, in finding of fact No. VIII, the trial court found:

". . . in response to plaintiff's complaint about the dripping of the faucet, Peter Sanstol saw a *surface check or crack* in the underside of the faucet handle; that said faucet operated in a horizontal plane; that in order to see it, Sanstol had to get down and peer up under the faucet; *the court, however, does not believe nor find that at the time such claimed defect was seen by Peter Sanstol that he attached, or had reason to attach, any particular significance to it or had reason to believe that it was, because of such condition, dangerous or defective*; . . . that from an examination of the handle after the break therein, the effective strength of the handle was reduced *by the crack* no more than one-third; that by reason thereof it required an unusual amount of force exerted upon the handle to fracture it." (Italics mine.)

By reason of the above findings, it should be clear (1) that Sanstol made a careful examination of the faucet in question; (2) that, as a result thereof, he saw a crack (or what he thought was a crack) in the porcelain handle; (3) that he reported the cracked porcelain handle (*which, in fact, later proved to be cracked*) to the respondent's manager.

The reasoning of this court in *Johnston v. Nichols,* 83

Wash. 394, 145 Pac. 417 (1915) is sound and should be applied in the case at bar. In that case this court said:

". . . In the absence of a warranty or covenant to repair, there is no greater duty of inspection upon the landlord than there is upon the tenant. The law imposes no burden of diligence or active duty upon the landlord to find and disclose obscure defects or dangers. The only exception in the absence of a contract to the rule *caveat emptor* is *where there are obscure or latent defects or dangers known to the landlord and not known to the tenant. This exception is grounded in reason and in the fundamental principles of justice. It rests upon, and is sustained by, the moral obligation of every man knowing a danger to warn the innocent or the ignorant against that which may beset or befall him in the use of property which is put into his hands for a present or prospective consideration moving to the donor, vendor, or lessor.*" (Italics mine.)

The respondent may not have been under any duty to inspect the premises after the commencement of the tenancy, but assuming this to be true, the respondent's agent Sanstol, nevertheless did, in fact, inspect the faucet in the appellant's room, and respondent's manager was informed of a dripping faucet and a crack in the porcelain handle. The trial court appears to have been convinced that Sanstol did not believe the condition of the faucet was dangerous or defective. This, I believe, is immaterial. Sanstol reported a *cracked* porcelain handle, and respondent's manager *knew or should have known* that such condition constituted a dangerous latent defect, particularly under the circumstances of this case where there was a combination of a *leaky faucet* and a *cracked porcelain handle,* creating a likelihood of additional pressure being exerted on the cracked handle to shut off the leak.

Let us review briefly the testimony in the record concerning "cracked" porcelain handles in general.

Dr. R. S. Mosiman, a witness for the appellant, testified:

"Q. Are these porcelain faucet hand injuries well known to doctors? A. Oh, yes. This is a definite entity. This is something that happens quite commonly. Not as commonly as it used to when porcelain faucets were more common, but

*it is called a 'porcelain faucet injury.'* It is a definite thing."
(Italics mine.)

Mr. T. E. Himmelman, vice president of Western Hotels, Inc., and a witness for the respondent, testified on cross-examination:

"Q. Mr. Himmelman, assume that a porcelain handle, faucet handle, had a crack in it, running underneath the handle; would you consider that to be a defective handle, or not? A. I think we would replace it. Q. You say you think? A. Yes. Q. You haven't answered my question. . . . Q. Why would you replace it? A. Our housekeeper and engineer would replace it because it probably wasn't first class. Q. *Would that be a safety precaution, by any chance?* A. Could be." (Italics mine.)

Mr. D. C. Haas, owner of an apartment house and a witness for the respondent, testified on cross-examination:

"A. . . . I would consider *a badly cracked* porcelain faucet handle as an undesirable piece of equipment. Q. From what standpoint would it be? A. *From the standpoint it was unsafe to leave on the fixture.*" (Italics mine.)

Henry Clay Agnew, superior court judge and owner of an apartment building, a witness for the respondent, testified on cross-examination:

"Q. Have you any opinion on whether a crack in a porcelain faucet would indicate it to be unsafe or dangerous? A. No, I have no opinion on it."

Mr. Alfred Seitz, superintendent of a heating and plumbing company, a witness for the appellant, testified:

"Q. Well, Mr. Seitz, is there any way of telling when a crack appears on a piece of porcelain, whether it is through in the material or not? A. To my knowledge, no. Q. The only way you could tell is to take the faucet and break it down? A. Possibly X-raying it, or actually breaking it to see—to see the depth of the fracture. Q. *Mr. Seitz, if you had a porcelain faucet, such as we have here, with a definite crack in it, would you say it was defective? A. I would.* . . . Q. *Would you say it was dangerous? A. Yes, sir. That is one of the recommendations—one of the points when we suggest and recommend changing it because of the danger factor on it. Q. What is the danger factor of it?*

*A. Breakage of it, and the fact it breaks to a sharp edge, and therefore presents a certain hazard."* (Italics mine.)

Mr. Peter Lee, plumber, a witness for the appellant, testified:

"Q. Is a crack in a porcelain faucet considered dangerous or defective in the plumbing trade?  A.  Yes."

It appears from the foregoing testimony that the use of a cracked porcelain faucet handle would be dangerous under the facts of this case when used in connection with a dripping faucet, and that the evidence clearly preponderates against any finding to the contrary.

The trial court appears to have placed considerable weight upon the testimony of Mr. C. W. Smith, a chemical engineer who examined the handle after it broke, concluding therefrom that Sanstol did not see a crack but only a surface check.  He was not an apartment or hotel owner or manager.  He had worked with porcelain materials but had no experience in examining porcelain faucet handles.  He testified on cross-examination:

"Q. Have you had any other experience than you just related, other than this porcelain faucet,—any other porcelain faucets you have examined?  A. *I think not, no faucets. I have worked with porcelain or porcelain materials, but not faucets.* . . .  Q. Mr. Smith, if you had noticed a crack in this particular porcelain handle, would you consider it defective or inconsequential?  A. Examining it only as one would see it on this type of thing, *I would question it was a crack or surface check, knowing what I know about the materials.* Q. In other words, you are not able to see whether it is a crack or surface check?  A. *I know it is a crack, because once it is open we can see it is a crack, but prior this crack, I suspect,* would look like the remainder of this extension, and there is no way of knowing if it is a surface check, *or goes all the way through,* so knowing that porcelain glazes are the weakest point of a porcelain article, I *would be susceptible to thinking* that was surface crazing, as often occurs."  (Italics mine.)

On further cross-examination, he testified as follows:

"Q. According to your testimony, Mr. Smith, there is no way to tell, in examining *a porcelain faucet,* when you see a crack, whether that is merely surface crazing, is that cor-

rect? A. Unless an X-ray might show it up. I don't know whether it would or not. By superficial examination, it isn't. Q. Your only other method of determining it would be to take the faucet apart and remove the porcelain to see if the crack had—A. That would be one destructive way of finding if it was a crack: take it off, and break it open. Q. *According to your testimony, there is absolutely no way of telling whether a faucet is defective?* By casual inspection it would only indicate surface crazing? A. *That is all it would indicate—as a surface crack.*" (Italics mine.)

Mr. Smith concluded that in the instant case a break through the porcelain would not be revealed by a visual inspection of the faucet, prior to when it actually broke; that all that could be seen would be a surface check or chemical stain which would have no effect upon the underlying structure or strength of the porcelain.

If Mr. Smith's testimony is carefully considered, the effect would be to establish a standard of care that would provide complete immunity to hotel and apartment owners when sued by guests or tenants for injuries received by cracked porcelain handles breaking, because there would be no way, outside of X-raying and breaking the handles open, to determine whether they are defective. Hotel and apartment owners are not insurers of their guest's health and safety, but on the other hand they should not be immune from liability where facts are established, as in the case at bar.

The trial court, however, could not reach the conclusion, from Smith's testimony, that Sanstol did not see a crack and reconcile such a conclusion with his own finding (No. VIII) that "Peter Sanstol *saw* a surface check *or crack* in the underside of the faucet handle," and with the further finding that the faucet handle was, in fact, cracked. (finding No. VIII)

The appellant sustained the burden of proof placed upon him. The respondent received notice of a "cracked" porcelain faucet handle and a dripping faucet through the report of its agent. Men of ordinary experience in the business in which the respondent is engaged know, or should know, that the use of cracked porcelain handles is dangerous

under these conditions; therefore, the respondent knew or was chargeable with such knowledge. After the respondent acquired knowledge of the dangerous latent defect, it was under the duty to warn the appellant so that he could guard against injury.

The judgment should be reversed with direction to the trial court to enter judgment in favor of the appellant for damages in the amount found by the court at the time of trial.

I dissent.

MALLERY and ROSELLINI, JJ., concur with HUNTER, J.